# In the
# United States Court of Appeals
## For the Seventh Circuit

—————

No. 04-1293

RONALD E. BURT,

*Petitioner-Appellant,*

*v.*

ALAN M. UCHTMAN,

*Respondent-Appellee.*

—————

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 02 C 50351—**Philip G. Reinhard**, *Judge.*

—————

ARGUED JULY 6, 2005—DECIDED SEPTEMBER 6, 2005

—————

Before COFFEY, RIPPLE, and ROVNER, *Circuit Judges.*

COFFEY, *Circuit Judge.* Ronald Burt was sentenced to death for the murders of H. Steven Roy and Kevin Muto. His sentence was later commuted to life imprisonment when the Governor of Illinois granted clemency to all death row inmates. Burt was tried before a jury, but near the end of the state's case-in-chief he abruptly changed his plea to guilty without any concessions from the government and against the strenuous advice of his attorneys. During the more than 14 months between his arrest and guilty plea, Burt was taking a number of powerful psychotropic medications prescribed for him by prison doctors. Burt was examined by a psychologist eight months before his trial

began, and the doctor, while noting several psychological impairments, deemed him fit to stand trial. The psychologist, however, did not consult Burt's medication records and his report mentions only in passing that Burt was even on medication. Neither defense counsel nor the trial court ever requested a further evaluation to determine if Burt was competent at the time he pleaded guilty. Burt's direct appeal, state post-conviction petition, and petition for habeas corpus in the district court, 28 U.S.C. § 2254, were all unsuccessful. We granted Burt a certificate of appealability on two issues: (1) whether he was denied due process when the trial court failed to order a hearing into his fitness to plead guilty, and (2) whether he was denied effective assistance of counsel when his attorneys failed to request a renewed examination of his fitness. For the reasons set forth below, we conclude that the Illinois Supreme Court unreasonably applied clearly established federal law on both issues. Accordingly, we reverse the district court's denial of Burt's petition and remand with instructions to grant the writ of habeas corpus unless Illinois informs the district court within a reasonable time to be determined by the district court that it intends to retry Burt.

# I. BACKGROUND

## A. Facts of the offenses

These facts are taken from the Illinois Supreme Court's opinion resolving Burt's direct appeal. *See People v. Burt*, 658 N.E.2d 375 (Ill. 1995) (*Burt I*). On January 16, 1992 police in Stephenson County were summoned to Roy's farm after a neighbor discovered that Roy and a farmhand, Muto, had been fatally shot. The following day officers arrested Burt, Dannie Booth, and David Craig for the murders of the two men. Burt initially claimed to know nothing about the murders, but he later offered to give a statement after the detectives investigating the case told him that Booth and

Craig had both identified him as one of the assailants.

Burt eventually gave three statements to the police. In his first statement, he said that Booth, who was 14 years old at the time, had asked him and Craig to help collect $500 Roy owed him. Upon arriving at the farm, Booth went to argue with Roy while Burt and Craig waited in another room. While waiting, they searched the room and Burt found Roy's rifle in a closet. He was holding the rifle when Roy and Booth, still arguing, entered the room. Burt pointed the gun at Roy, demanded his wallet, and then ordered him to walk to a back room. Once in the back room, Burt said that Roy made a sudden movement. Burt claimed this movement made him fear that Roy might be trying to "pull something," and he shot Roy in the back of the head. Booth then grabbed the rifle and shot Roy several more times.

Burt, Craig, and Booth remained in the house and took some of Roy's belongings, at which point Muto knocked on the back door. Burt answered the door and told him to leave; when Muto refused to leave, Booth forced him at gunpoint into a different back room and, after taking his wallet, shot Muto in the back of the head and in the back. Burt grabbed the gun and again shot Muto in the back. The three men then fled the farm with Roy's VCR, some meat from his refrigerator, and some of his personal checks.

The next day, Burt gave a second statement to the police. His second statement was very similar to the first except he added that, after shooting Roy, he and Craig discussed killing Booth because they feared he would report them to the police. A few days later, Burt gave a third statement. In this statement he denied shooting Muto and claimed that Booth was wholly responsible for that murder. Burt said that he had previously wanted to protect Booth because Booth was so young but that he changed his mind after learning that Booth was blaming him for the murders. The

trial court suppressed the third statement as hearsay. Later, Booth and Craig each pleaded guilty to one count of murder and were sentenced, respectively, to 40 years' and 28 years' imprisonment.

## B. Procedural history and psychological treatment

On January 31, 1992, two weeks after his admission to the Stephenson County Jail, Burt was seen by a Dr. Modir, who prescribed the antidepressant doxepin[1] (brand name Sinequan). Shortly thereafter Burt, Booth, and Craig were all indicted for two counts of first-degree murder, armed robbery, home invasion, armed violence, and theft. After his indictment Burt was transferred to Stateville Penitentiary and continued to take Sinequan. In April 1992 Burt had his first of many appointments with Dr. Edward Navakas, a psychiatrist at Stateville. Dr. Navakas continued Burt's prescription for Sinequan and also added a new prescription for an anti-anxiety medication, diazepam[2] (brand name Valium). In May 1992 Dr. Navakas prescribed another antidepressant, imipramine[3] (brand name Tofranil), and

---

[1] "Doxepin is in a class of drugs called tricyclic antidepressants. Doxepin affects chemicals in the brain that may become unbalanced and cause depression." http://www.drugs.com/xq/cfm/pageid_0/htm_D00217A1.htm/type_mtm/tgid_28/bn_Sinequan/qx/index.htm.

[2] "Diazepam is in a class of drugs called benzodiazepines. Diazepam affects chemicals in the brain that may become unbalanced and cause anxiety, seizures, and muscle spasms." http://www.drugs.com/xq/cfm/pageid_0/htm_D00148A1.htm/type_mtm/tgid_28/bn_diazepam/qx/index.htm.

[3] "Imipramine is in a class of drugs called tricyclic antidepressants. Imipramine affects chemicals in the brain that may become

(continued...)

doubled Burt's dosage of Valium.

The Circuit Court for the Fifteenth Judicial Circuit appointed two attorneys, Thomas Nettles and John Vogt, to represent Burt. Neither Nettles nor Vogt had any experience defending a capital case and each moved to withdraw. The court denied their motions. Nettles and Vogt then requested an examination to determine if Burt was competent to stand trial. In July 1992, approximately eight months before trial, Burt was examined by Dr. Donald Pearson, a psychologist. On the day of the evaluation prison officials refused to dispense his medications because, in Burt's words, they did not want him "doped up" for the examination. Dr. Pearson opined that Burt was competent to stand trial despite suffering from antisocial personality disorder, substance abuse disorder, attention deficit hyperactive disorder, and "borderline" intelligence reflecting minor mental retardation. Dr. Pearson's report also noted that Burt was scared of imaginary snakes in his cell. Dr. Pearson mentioned that Burt reported taking Sinequan and Valium, but he made no further mention of Burt's medications and did not review Dr. Navakas's records.

Approximately two weeks after Burt was examined by Dr. Pearson, Dr. Navakas again changed Burt's medications when he discontinued Sinequan and increased the dosage of Tofranil. Three weeks later on August 18 Dr. Navakas prescribed a new anti-psychotic drug, thioridazine[4] (brand

---

[3] (...continued)
unbalanced and cause depression." http://www.drugs.com/xq/cfm/pageid_0/htm_D00259A1.htm/type_mtm/tgid_28/bn_Tofranil/qx/index.htm.

[4] "Thioridazine is in a class of drugs called phenothiazines. It works by changing the actions of chemicals in the brain. . . . Thioridazine is used to treat psychotic disorders,
(continued...)

name Mellaril), and maintained Tofranil and Valium. On August 28 Dr. Navakas increased the dosages of both Mellaril and Tofranil, while continuing Valium at its previous level. Dr. Navakas also made a notation that he was discontinuing Sinequan, even though Burt was not then taking that drug. From August 1992 until February 1993 Burt continued to see Dr. Navakas, who continued to prescribe Mellaril, Tofranil, and Valium. Dr. Navakas's notes for September 16, 1992 show a new prescription for Sinequan, but his notes for Burt's next appointment on December 11, 1992 make no mention of that drug.

In November 1992 Burt was examined by another psychologist, Dr. Linda Wetzel, in connection with a defense motion to suppress his confessions. Dr. Wetzel calculated Burt's IQ as 79, placing him in the 9th percentile for his age group, and she diagnosed him as having a brain impairment of the frontal cerebral lobe that had been exacerbated by numerous childhood head injuries. She wrote:

> His memory deteriorates to a retarded level after a delay of only 30 minutes. His mental flexibility is severely impaired and motor speed is moderately to severely impaired. Language abilities are spared which allows him to appear brighter than his actual borderline intelligence level. He is further handicapped by his severe depression which interferes with his ability to concentrate.

Dr. Wetzel concluded that Burt's condition resulted in "poor impulse control, poor judgment, and inability to monitor

---

[4] (...continued)
such as schizophrenia. Thioridazine is generally reserved for people who do not respond to other drugs or who cannot take other drugs due to side effects." http://www.drugs.com/xq/cfm/pageid_0/htm_D00389A1.htm/ type_mtm/tgid_28/bn_Mellaril/qx/index.htm.

and self-correct behavior."

Six weeks before trial on February 2, 1993 Burt told Dr. Navakas about a painful growth on the left side of his chest. Dr. Navakas determined that the growth was caused by the Mellaril, so he cut Burt's dosage in half, while maintaining him on the same doses of Tofranil and Valium.

Burt's trial began in mid-March 1993. During jury selection on March 19 Burt's attorneys requested a continuance. Nettles explained that Burt "does not feel he is able to continue to assist us in the selection of jurors today." He added that Burt was having difficulty sleeping and "feels that because of his inability to sleep and because of the medication that he would not be able to assist on today's date in selecting these jurors." The court denied a continuance but told Burt it would reconsider "if I detect you're having trouble staying awake."

On March 26, the fourth day of trial during the state's case-in-chief, Attorney Vogt announced that Burt wished to plead guilty. Vogt added that "we've spoken . . . with our client last night and I also spoke with him this morning for some time . . . and we told him that we didn't think it was appropriate and would be against our advise [sic] to do that, but he insists on it with us and wants to do it."

The court admonished Burt of the consequences of pleading guilty, including that he would be eligible for the death penalty. The court also briefly inquired about Burt's mental condition:

> THE COURT:     Are you getting all the medication you're prescribed at this time? Are you getting it over at the jail?
>
> DEFENDANT: Yes, I am.
>
> THE COURT:     You feel rested this morning?

DEFENDANT: I feel about the same.

THE COURT:    About the same, but that was a prob-
lem the other morning, but I've
watched. You've been alert, I think,
through the trial. And you've dis-
cussed this with your attorneys have
you not?

DEFENDANT: Yes.

THE COURT:    Okay. Are you following their advice
or do they disagree with you on that?

DEFENDANT: They disagree.

The court then cautioned Burt to consider his attorneys'
advice. After Burt said he still wished to plead guilty, the
court finished admonishing him of the consequences of his
decision and then accepted the guilty plea. At a sentencing
hearing begun later that day, the parties presented evi-
dence of aggravating and mitigating circumstances. The
jury on April 1 sentenced Burt to death.

Burt filed a timely motion to withdraw his plea in which
he argued, among other things, that his guilty plea was not
voluntarily and intelligently made because his mental
deficiencies and heavy medications rendered him incompe-
tent at the time he changed his plea. The court denied that
motion. Burt continued to take a variety of psychotropic
medications throughout his post-trial proceedings. The
Illinois Supreme Court affirmed Burt's convictions on direct
appeal, *Burt I*, 658 N.E.2d 375, and the United States
Supreme Court denied certiorari, *Burt v. Illinois*, 517 U.S.
1211 (1996).

Burt then filed a petition for state post-conviction relief,
asserting in part that he was denied due process when the
trial court failed to order a new competency hearing and
that he was denied effective assistance of counsel when his
attorneys failed to request one. Burt's petition was sup-

ported by, among other things, an affidavit from one of his trial attorneys and a report by Dr. Lyle Rossiter, a Board certified forensic psychiatrist who reviewed Burt's medical history. Attorney Nettles's affidavit stated he was aware that Burt was taking psychotropic medication throughout Burt's pre-trial incarceration. It also stated that Burt exhibited "frequent swings of mood" and often "demonstrated belligerent or explosive behavior" in his presence. Nettles further stated that Burt threatened to become violent in the courtroom on multiple occasions and once threatened to attack him. Nettles believed, "Burt did not fully comprehend legal advice and that his behavior throughout the trial, particularly his decision to change his plea to guilty, was not rational." Finally, "Burt insisted on changing his plea to guilty largely because he was not permitted to smoke in the Stephenson County Jail, and was anxious to return to prison where smoking was permitted."

Dr. Rossiter's report stated that "this defendant's history of head injury with probable brain damage renders him more susceptible to the adverse effects of psychotropic medication." Dr. Rossiter opined that Burt should have had a fitness hearing because he "was taking powerful psychotropic medications at the time of his March 1993 trial, and he had a long history of psychiatric disorders and evidence of brain damage."

The circuit court dismissed Burt's post-conviction petition in December 1998. The Illinois Supreme Court, with two dissenting justices, affirmed. *People v. Burt*, 792 N.E.2d 1250 (Ill. 2001) (*Burt II*). As relevant here, the majority held that Burt was not denied effective assistance of counsel when his attorneys failed to request a fitness hearing before the court accepted his guilty plea because he did not show a bona fide doubt as to his competency to plead guilty and thus could not establish that he was prejudiced by his attorneys' failure to request a new competency hearing. *Id.* at 1261. The court held that Burt's

failure to establish a bona fide doubt as to his competency was likewise fatal to his due process claim. *Id.* at 1261-62. Chief Justice Harrison dissented, arguing that Burt's abrupt decision to plead guilty without seeking any concessions from the prosecution was "an inherently irrational act" because of his "certain" eligibility for the death penalty. *Id.* at 1264. The Chief Justice added that Burt's psychiatric history showed that "[t]here can be no real doubt, however, that whatever decisionmaking sense [Burt] possessed abandoned him during the trial." *Id.* Justice Kilbride also dissented, noting that "there is no explanation of why counsel could not or did not procure any concessions from the State in return for defendant's guilty plea, such as an agreement not to seek the death penalty." *Id.* at 1265. The United States Supreme Court again denied certiorari. *Burt v. Illinois*, 536 U.S. 925 (2002). The Governor of Illinois eventually commuted Burt's sentence to life imprisonment as part of a blanket commutation of all Illinois death sentences.

Burt then petitioned the district court for a writ of habeas corpus, 28 U.S.C. § 2254, again asserting that he was denied due process and effective assistance of counsel. As relevant here, the district court found that the Illinois Supreme Court reasonably concluded that Burt's due process claim failed because he could not establish a bona fide doubt about his competency. The district court also found that the Illinois Supreme Court reasonably concluded that Burt could not establish that he was prejudiced by his counsel's failure to request a fitness hearing because he had not established a bona fide doubt about his competency to stand trial. We granted Burt a certificate of appealability on two issues: (1) whether Burt was denied due process when the trial court failed to conduct a fitness hearing prior to accepting his guilty plea, and (2) whether his attorneys rendered ineffective assistance by failing to request a competency hearing either immediately before trial or

before the court accepted Burt's change of plea.

## II.  DISCUSSION

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides that a defendant cannot prevail on a petition for habeas corpus unless he shows that a state court rendered a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d); *see also Matheney v. Anderson*, 377 F.3d 740, 747 (7th Cir. 2004). Burt argues that the Illinois Supreme Court unreasonably applied the federal law relevant to each of his claims. We recognize that we may not grant relief under the "unreasonable application" prong unless the state court's application of Supreme Court precedent "l[ies] well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002).

### A.  Due process claim

Burt first argues that he was denied due process when the trial court failed *sua sponte* to order a fitness hearing before accepting his guilty plea despite knowing about his history of psychological problems and his heavy use of psychotropic medication. A criminal defendant must be mentally competent to stand trial. *Drope v. Missouri*, 420 U.S. 162, 171 (1975). The question of whether a defendant is competent focuses on "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). A defendant must also be competent at the time he pleads

guilty, and the standard governing competency to plead guilty is the same as that used to evaluate competency to stand trial. *Godinez v. Moran*, 509 U.S. 389, 398-99 (1993). Where the evidence before a trial court raises a bona fide doubt as to the defendant's competency, due process requires the court *sua sponte* to order a competency hearing. *Pate v. Robinson*, 383 U.S. 375, 385 (1966).

The Illinois Supreme Court found that Burt failed to establish a bona fide doubt as to his competency to plead guilty for several reasons. First, Burt's decision to disregard his attorneys' advice when pleading guilty demonstrated independent thought and "shows that his will was not 'flattened.'" *Burt II*, 792 N.E.2d at 1259. Second, Dr. Navakas at one point wrote that Burt seemed motivated to continue his legal defense. *Id.* Third, Burt clearly understood the consequences of pleading guilty because the trial court admonished him before accepting the plea. *Id.* at 1259-60. Fourth, the court noted a remark made by the trial court at sentencing that, despite one outburst and the incident when he claimed to be too tired to participate in jury selection, Burt "conducted himself very well and very normally throughout the proceedings." *Id.* at 1260. Fifth, although Attorney Nettles's affidavit showed that Burt was belligerent and explosive, it did not address whether he could understand the proceedings and participate in his defense. *Id.* at 1260-61. Finally, the court disregarded Dr. Rossiter's report, stating that "[i]t is for this court, and not Dr. Rossiter, to determine whether there existed a *bona fide* doubt of defendant's fitness." *Id.* at 1261.

The Illinois Supreme Court's logic is troubling in many respects. First, it is odd to think that a defendant with severe psychological problems is showing strong independent thought when he suddenly makes a highly questionable strategic decision to plead guilty against the strenuous advice of his counsel. Nothing prevents a defendant from making poor tactical choices, including abruptly pleading

guilty in the midst of trial. *See Gosier v. Welborn*, 175 F.3d 504, 508-09 (7th Cir. 1999). And a desire to plead guilty motivated by something like a belated sense of compassion for the victim or a religious conversion may well be fully rational. *See id.* But we have also recognized that a sudden guilty plea with no attempt to seek concessions from the prosecution may, when coupled with other evidence of mental problems, raise doubts as to the defendant's competency. *See United States v. Johns*, 728 F.2d 953, 956 (7th Cir. 1984). The court's conclusion that Burt's plea demonstrated a strong will ignores the context in which he pleaded guilty: Burt has significantly below average intelligence and had been diagnosed with attention deficit hyperactive disorder and a brain impairment that made him prone to poor impulse control. A sudden and highly questionable tactical decision seems more likely a product of his mental deficiencies than strong will and reasoned thought.

Other portions of the court's reasoning are also suspect. The observation that the court admonished Burt of the consequences of pleading guilty is irrelevant to his claim of incompetency. If Burt was in fact unable to understand the proceedings, that the court informed him of the consequences of a guilty plea would make no difference. The trial court's observation that Burt was well-behaved in court also gives us pause because it is so at odds with Nettles's affidavit, which states that Burt exhibited violent behavior in court and that his frequent mood swings caused several delays in the proceedings. We hasten to add, however, that Burt does not attempt to rebut the presumption that this factual finding of the Illinois Supreme Court is correct. *See Mahaffey v. Schomig*, 294 F.3d 907, 915 (7th Cir. 2002). Finally, the court's decision to disregard Dr. Rossiter's report without explanation is troubling. Dr. Rossiter reviewed Burt's medical history as a medical expert and, while an expert's report need not be considered conclusive,

the court should have at least considered Dr. Rossiter's findings. *See Matheney*, 377 F.3d at 748.

Our disagreements with the Illinois Supreme Court's reasoning do not, by themselves, justify granting Burt's petition for habeas corpus because AEDPA requires that we show great deference to the state court. *See id.* at 747. But no level of deference permits us to overlook the most critical shortcoming of the Illinois Supreme Court's opinion—its total failure to address whether Burt was entitled to a competency hearing before pleading guilty given the heavy and ever-changing doses of psychotropic medication he was taking.

Burt correctly observes both that no medical expert ever opined on his fitness to stand trial while he was heavily medicated and that the Illinois Supreme Court never addressed this crucial fact or the wealth of other information that should have alerted the trial court to the need for a new competency hearing before accepting his guilty plea. Burt was examined by Dr. Pearson eight months before trial on a day when prison officials refused to dispense his prescribed medications. Dr. Pearson made no effort to review Burt's psychiatric history and did not even review Dr. Navakas's records when finding Burt fit to stand trial. *See Brown v. Sternes*, 304 F.3d 677, 697 (7th Cir. 2002) (psychiatrist's opinion as to defendant's competency undermined by his failure to review medical history). Furthermore, Burt's medications changed significantly between the time Dr. Pearson examined him and the time he pleaded guilty. Immediately before seeing Dr. Pearson, Burt's daily medication regimen was 150 mg of Sinequan, 20 mg of Valium, and 50 mg of Tofranil. During trial, he was taking 100 mg of Mellaril (down from a high dosage of 200 mg six weeks before trial), 20 mg of Valium, and 150 mg of Tofranil. Thus, Burt's dosage of Tofranil tripled and he switched from Sinequan to Mellaril between his fitness examination and his trial. Moreover, Dr. Rossiter later

opined that Burt was particularly susceptible to the effects of these powerful drugs because of his brain damage.

The trial court was well aware that Burt was taking an array of powerful psychotropic medications both before and during trial. *See Pitsonbarger v. Gramley*, 141 F.3d 728, 736 (7th Cir. 1998) ("the charge that a defendant was under the influence of psychotropic drugs at or near the time of trial is a serious one"). It was also aware that Burt had experienced difficulty staying awake during jury selection. Yet when the court learned that Burt suddenly wished to plead guilty against his attorneys' advice, the court asked only two questions about his mental condition. First, the court asked if he had taken his medication, making no further inquiry into what effect the drugs were then having on him. Second, the court asked how Burt was feeling. But when Burt replied that he felt "about the same," the court responded: "About the same, but that was a problem the other morning, but I've watched. You've been alert, I think, through the trial." Rather than following up with another question, the court instead concluded on its own that Burt was alert and gave him no further chance to elaborate.

If ever there was a case in which a trial court should have *sua sponte* ordered a renewed competency hearing, this is that case. Dr. Pearson's report made the trial court fully aware that Burt was a man of significantly below average intelligence with a history of psychological problems. The court knew that Burt was taking large doses of powerful psychotropic medications and that Dr. Pearson's report barely mentioned those drugs. The court also knew that at one point during the trial Burt was having such difficulty remaining alert that his attorneys felt compelled to request a continuance. Lastly, Burt's sudden unexplained decision to plead guilty against the advice of counsel when he faced certain eligibility for the death penalty should have caused the court to consider whether he was competent to make that decision. The trial court never should have accepted

Burt's guilty plea without first ordering a renewed compe-
tency hearing, and the Illinois Supreme Court unreasonably
applied clearly established federal law when it found that
Burt was not denied due process. *See Pate*, 383 U.S. at 385.

### B. Ineffective assistance of counsel

Although we conclude that Burt must prevail on his due
process claim, we will also address his second argu-
ment—that his attorneys provided ineffective assistance
when they failed to request a renewed fitness examination
either shortly before trial or, at a minimum, before the
court accepted the guilty plea. A criminal defendant has a
Sixth Amendment right to be represented by effective
counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).
In order to establish that he was denied the effective
assistance of counsel, a defendant must show both that
counsel's performance was deficient and that he was
prejudiced by his attorneys' errors. *Id.* at 687. Counsel has
an obligation either to investigate possible defenses or make
reasonable decisions that particular investigations are
unnecessary. *Kimmelman v. Morrison*, 477 U.S. 365, 385
(1986). The relevant inquiry on the prejudice prong focuses
on whether counsel's deficient performance renders the
result of the trial unreliable or fundamentally unfair.
*Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Where a
defendant argues that he should have received a fitness
hearing, we have interpreted the prejudice inquiry as
asking whether there is a reasonable probability the
defendant would have been found unfit had a hearing been
held. *Eddmonds v. Peters*, 93 F.3d 1307, 1317 (7th Cir.
1996).

The Illinois Supreme Court held that Burt was not denied
effective assistance of counsel. *Burt II*, 792 N.E.2d at 1261.
The court did not address the first prong of the *Strickland*
analysis and instead concluded that Burt could not estab-

lish prejudice because he could not show a bona fide doubt that he was competent at the time of trial. *Id.* The court's analysis of the prejudice prong of *Strickland* is identical to that used for his due process claim and we need not reiterate our concerns with that reasoning.

But Burt's ineffectiveness claim presents even more compelling reasons for granting his petition than does his due process claim because Burt's attorneys had access to additional information suggesting he was incompetent than did the trial court. Burt's attorneys both admitted they were unaware of a then-existing Illinois statute that provided a mandatory fitness hearing for any defendant taking psychotropic medication at the time of trial. *See* 725 ILCS 5/104-21(a) (1993) ("A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication."). As the Illinois Supreme Court observed, Burt's right to receive the particular hearing described in 725 ILCS 5/104-21(a) arose from a state statute and is thus not independently cognizable in a petition for habeas corpus. *Burt II*, 792 N.E.2d at 1257; *see also Estelle v. McGuire*, 502 U.S. 62, 67, 68 (1991) (errors of state law are not cognizable in a petition for habeas corpus unless they result in the violation of a constitutional or federal right). The question before us, however, is not whether Illinois courts followed proper procedures under state law but, rather, whether Burt's attorneys provided constitutionally ineffective assistance by failing to seek any type of competency hearing. *See Pitsonbarger*, 141 F.3d at 736.

Burt's attorneys were aware of several pieces of information beyond what was available to the trial court that should have alerted them to the need for a new competency hearing. First, counsel learned that Burt desperately wanted to smoke and that smoking was prohibited at the county jail where he was being held during trial. Nettles's affidavit states: "Burt insisted on changing his plea to

guilty largely because he was not permitted to smoke in the Stephenson County Jail, and was anxious to return to prison where smoking was permitted." That Burt's desire to have a cigarette, in counsel's mind, trumped his desire to defend himself against capital murder charges should have suggested to counsel that Burt was not thinking clearly and not making rational decisions to assist in his defense. *See Burt II*, 792 N.E.2d at 1264 (Harrison, C.J., dissenting).

Indeed, Burt never explained why he decided to plead guilty and the state has never even suggested a possible rational explanation for his decision. *Cf. Gosier*, 175 F.3d at 508-09 (defendant's sudden guilty plea motivated by religious conversion and newfound sense of remorse). Burt later explained in an affidavit: "I pled guilty because of my extreme frustration over my inability to focus on or under-stand what was going on in court." Burt also stated that at the time of trial he was "even more drowsy and unable to focus than I was previously, including around the time I was examined by Dr. Pearson."

Counsel had ample opportunity to observe Burt's behavior both in and out of the courtroom. Nettles's affidavit men-tioned Burt's "frequent swings of mood," which he attrib-uted in part to a belief that the county jail was administer-ing Burt's medication on an irregular schedule. Burt's mood swings were so pronounced that Nettles and Vogt "would meet with Burt every morning before court to evaluate his mental state." It "often happened" that Burt "demonstrated belligerent or explosive behavior," such as threatening others in the courtroom. Nettles "was continually afraid that Burt would commit violent acts in court, and made constant efforts to appease him." Finally, Nettles believed that "Burt did not fully comprehend legal advice and that his behavior throughout the trial, particularly his decision to change his plea to guilty, was not rational."

Nettles's fears that Burt would become violent were

supported by Dr. Navakas's records, which were provided to defense counsel at their request. In December 1992 Burt reported to Dr. Navakas that he wanted to die and threatened to "kill someone in the court room" if he was given a life sentence as opposed to a death sentence. The respondent interprets this report to mean that Burt had carefully considered his potential sentences and preferred execution to life imprisonment: "Thus, rather than demonstrating a *bona fide* doubt as to his fitness, in context, his decision to change his plea reflects a reasoned choice." But when combined with the other evidence discussed above, Dr. Navakas's report of Burt's mental condition and hope for his own execution should have raised alarms for counsel.

We conclude, as the Illinois Supreme Court apparently assumed, that counsel provided deficient performance by not requesting a renewed fitness hearing for Burt. The only time Burt was examined by an expert to evaluate his competency was eight months before trial. The Supreme Court, however, has emphasized that a defendant's competency must be evaluated at the time of trial and that his condition can change as proceedings unfold. *Drope*, 420 U.S. at 181 ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."); *see also Pate*, 383 U.S. at 387 (discussing importance of a contemporaneous competency hearing). Counsel should have realized that Dr. Pearson's report left critical questions unanswered because Dr. Pearson failed to consider that Burt was taking multiple psychotropic medications. Furthermore, the report could not have addressed Burt's current psychological condition because of the numerous changes made to his prescriptions in the eight months between the examination and the start of trial.

Neither the respondent nor Burt's former attorneys

provided any conceivable tactical reason for counsel's decision not to request a new competency hearing. The only reason Nettles gave in his affidavit was that neither he nor Vogt was aware that Burt was entitled to a mandatory hearing under the then-existing version of 725 ILCS 5/104-21(a). But counsel should have been aware that Burt had a federal right not to stand trial unless he was competent, and the record raises significant questions as to Burt's competency at the time he pleaded guilty. The failure by defense counsel to investigate apparent problems with a defendant's mental health may be deficient performance as defined by the first prong of *Strickland. See Williams v. Taylor*, 529 U.S. 362, 395 (2000) ("[Counsel] failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records."); *Brown*, 304 F.3d at 692 (counsel failed to investigate defendant's mental health even though defendant was under psychiatric treatment, made irrational and uncontrolled outbursts at trial, and yelled at counsel's law clerk); *Brewer v. Aiken*, 935 F.2d 850, 858 (7th Cir. 1991) (counsel failed to investigate mental health when defendant had an IQ of 76 and a psychologist testified that defendant's condition made him particularly susceptible to the influences of other people). We conclude here that in light of the overwhelming evidence of Burt's psychological problems and heavy medication, counsel's failure to request a new competency hearing was deficient performance.

Burt must also establish that he was prejudiced by counsel's failure to request a hearing. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Burt was heavily medicated, reported fearing imaginary snakes in his cell, had difficulty staying awake during trial,

and told his attorneys that he wanted to plead guilty so he could return to state prison to smoke. His attorneys also observed that he was frequently violent and threatened to hurt others in the courtroom. These facts establish a reasonable probability that Burt would have been found incompetent at the time he pleaded guilty if his attorneys had requested a competency hearing. The Illinois Supreme Court's decision to the contrary was unreasonable.

We found prejudice in a similar appeal from the denial of a petition for habeas corpus in which a psychiatrist examined a defendant before trial but failed to review any records of his extensive history of psychiatric treatment. *See Brown*, 304 F.3d at 697-98. Those records showed that the defendant had long suffered from chronic schizophrenia and that an expert had opined that the defendant lacked powers of "logical, cohesive thinking." *Id.* at 698. The defendant was also taking " 'large doses' of anti-psychotic medication." *Id.* at 693. Similarly, Burt was heavily medicated and three experts had diagnosed him as suffering from psychiatric disorders that lowered his intelligence and made him prone to impulsive behavior. Dr. Pearson did not consider the possible effects of Burt's medications and neither defense counsel nor the trial court requested an examination to address that issue.

Moreover, unlike other cases in which we have held that defendants were not prejudiced by their attorneys' decisions not to request competency hearings, the conclusion that Burt was competent to stand trial rested solely on a single competency examination conducted months before trial. *Cf. Timberlake v. Davis*, 409 F.3d 819, 823 (7th Cir. 2005) (defendant examined twice before trial and once during post-conviction proceedings and found competent all three times); *Young v. Walls*, 311 F.3d 846, 848 (7th Cir. 2002) (defendant found competent three times before trial, and post-conviction court held separate competency hearing to evaluate his competency while on psychotropic medication);

*Eddmonds*, 93 F.3d at 1317 (defendant found competent five times in the two-and-a-half years before trial). We do not mean to suggest that a single competency hearing is necessarily insufficient. But Dr. Pearson's evaluation suffered from a number of faults, including that it was conducted months before trial, failed to consider any potential effects of Burt's heavy medication, and could not have taken into account the repeated changes in Burt's prescriptions between the date of the examination and the start of his trial.

Burt's ineffective assistance claim differs from his due process claim because the analysis for the due process claim focuses only on events that happened in court that should have alerted the trial judge to the need for a competency hearing. Although those events alone should have alerted both defense counsel and the trial court to the need for a new competency hearing, Burt's ineffective assistance claim is bolstered by a wealth of other evidence suggesting he was incompetent. The Illinois Supreme Court failed to acknowledge much of this evidence. Specifically, the court did not mention Nettles's statement in his affidavit that "Burt did not fully comprehend legal advice and that his behavior throughout the trial, particularly his decision to change his plea to guilty, was not rational." Nor did it mention Nettles's assertion that Burt's primary motivation for pleading guilty was so he could be returned to state prison where smoking was permitted.

The court likewise completely disregarded Dr. Rossiter's opinion that Burt's brain damage made him particularly susceptible to the adverse effects of the psychotropic drugs he was taking. Dr. Rossiter opined that Burt's psychiatric history and medication regimen warranted a competency hearing, and the Illinois Supreme Court simply ignored his report. Dr. Rossiter's report was particularly relevant because it highlighted one of the critical problems with Dr. Pearson's evaluation—its complete disregard for Burt's

extensive use of psychotropic medications. All the court said about Dr. Pearson's report was that he had deemed Burt competent to stand trial; the court did not mention that the evaluation was conducted eight months before trial or that it failed to address Burt's medications. *See Burt II*, 792 N.E.2d at 1258. These pieces of evidence all cast substantial doubt on Burt's competency at the time he pleaded guilty.

The Illinois Supreme Court unreasonably applied *Strickland* to the facts of Burt's case. The court did not address the first prong of the test. Its analysis of the second prong ignored a wealth of evidence that established a reasonable probability Burt would have been found incompetent had a hearing been held. *See Eddmonds*, 93 F.3d at 1317.

### III.  CONCLUSION

The judgment of the district court denying Burt's petition for a writ of habeas corpus is REVERSED. We REMAND with instructions to GRANT the writ of habeas corpus unless Illinois informs the district court within a reasonable time to be fixed by the district court that it intends to retry Burt.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*