In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3851

ALBERT J. PRICE,

*Petitioner-Appellant*,

*v.*

MICHAEL THURMER, Warden,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03-C-849—**Aaron E. Goodstein**, *Magistrate Judge*.

ARGUED SEPTEMBER 17, 2010—DECIDED APRIL 18, 2011

Before POSNER, KANNE, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. This habeas corpus case is before us for the second time, after the remand for an evidentiary hearing that we ordered in Price's first appeal. 514 F.3d 729 (7th Cir. 2008). The origin of the case is a bizarre incident of mayhem in 1991. Price was driving his truck and struck a pedestrian. He continued driving, pursued by an off-duty police officer; slammed into the rear of another vehicle, causing a four-car pile-up;

leapt out of his truck, swinging a machete; and injured three passersby with it before he was disarmed. He was growling and ranting, and when the police tried to subdue him he exhibited extraordinary strength and imperviousness to pain—he reacted neither to being pinned by an automobile nor to being shocked by a stun gun. Convicted by a jury in a Wisconsin state court of attempted murder and related crimes arising from the incident, he was sentenced to 185 years in prison. His lawyer had asked the jury to find him not guilty by reason of insanity, but the jury had refused.

Before appealing his conviction Price had initiated a state postconviction proceeding, contending among other things that his trial lawyer had been ineffective. After an evidentiary hearing the trial judge had rejected the complaint, as had the Wisconsin court of appeals, *State v. Price,* 2002 WL 563375 (Wis. App. Apr. 17, 2002) (per curiam), which heard his direct and postconviction appeals simultaneously because his direct appeal had been delayed for six years by his public defender's procrastination.

Having exhausted his state remedies, Price sought federal habeas corpus, but struck out in the district court. Our previous opinion affirmed the denial of relief on most of the grounds urged by him, but ordered an evidentiary hearing on his complaints about his lawyer's waiving a hearing on Price's mental competence to stand trial and failing to provide essential information to the court-appointed psychiatric witness. The district court conducted the hearing that we had directed, and again denied relief, precipitating this second appeal.

We begin with Price's competence to stand trial. He had a long history of mental disease and had been diagnosed as a paranoid schizophrenic, and his behavior during and immediately after the attack that led to his prosecution and conviction was consistent with insanity. His original lawyers had succeeded in getting the judge to agree to conduct a competency hearing, but they withdrew from the case at Price's request before the hearing was scheduled to take place. His new lawyer, the one he's complaining about, having been appointed just minutes before the hearing was scheduled to begin, asked for and was granted a 24-hour adjournment. The lawyer met with Price for three and a half hours during the adjournment, reviewed with him the court-ordered competency report (prepared by a Dr. Robert Miller), which had concluded that Price was competent to stand trial, and later testified that "there wasn't any doubt in my mind that Mr. Price was competent, and he [Price] felt the same way."

The fact that a person suffers from a mental illness does not mean that he's incompetent to stand trial. He need only be able to follow the proceedings and provide the information that his lawyer needs in order to conduct an adequate defense, and to participate in certain critical decisions, such as whether to appeal. *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975); *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam); *Woods v. McBride*, 430 F.3d 813, 817 (7th Cir. 2005). If he is being treated successfully with antipsychotic drugs, as in *Wilson v. Gaetz*, 608 F.3d 347, 349 (7th Cir. 2010), the fact that he has a mental illness (of which the drugs treat

merely the symptoms) does not render him incompetent to stand trial. It is the difference between having asthma and having an asthmatic attack, or having coronary artery disease and having a heart attack. When the lawyer met and talked to Price, Price gave no signs of being in a manic state, as he had been during and right after his assaults with the machete. It's unlikely that Dr. Miller would have changed his mind about Price's competence to stand trial had the lawyer challenged his opinion.

At the oral argument of the present appeal Price's lawyer ingeniously focused on his client's alleged inability to recall the details of the machete attack. The ingenuity lay in the fact that such amnesia would be consistent with his being lucid during the trial, yet might make it impossible for him to assist his counsel meaningfully because he had forgotten the acts for which he was being prosecuted. The problem with such a contention is that the defendant who didn't want to be tried right away might plead amnesia—and if years later he decided the time was now ripe for a trial because acquittal had become more likely might announce he'd regained his memory. There are tests for detecting false claims of amnesia, but "there is still . . . no 'gold standard' measure for distinguishing between cases of genuine and feigned amnesia." Xue Sun et al., "Does Feigning Amnesia Impair Subsequent Recall?," 37 *Memory & Cognition* 81 (2009). False pleas of amnesia by criminal defendants are both common and difficult to detect. Marko Jelicic, Harald Merckelbach & Saskia van Bergen, "Symptom

Validity Testing of Feigned Amnesia for a Mock Crime," 19 *Archives of Clinical Neuropsychology* 525 (2004).

We do not suggest that amnesia can never operate as a defense to competence to stand trial. But something more than the defendant's word would have to be shown, given the ease of making such a claim, the difficulty of countering it, and hence the temptation to abuse it. See *United States v. Andrews*, 469 F.3d 1113, 1118-19 (7th Cir. 2006); cf. *United States v. No Runner*, 590 F.3d 962, 965 and n. 2 (9th Cir. 2009); *United States v. Villegas*, 899 F.2d 1324, 1341 (2d Cir. 1990).

Consistent with our skepticism about a claim of amnesia, Price's lawyer testified that he had concluded on the basis of his meeting with Price to discuss competence to stand trial that Price "was able to help me." Ability to assist one's lawyer is the test of competence to stand trial.

We move on to the issue of Price's mental condition during his bout of violence. The issue has narrowed to whether the bout was a psychotic episode attributable to his paranoid schizophrenia, or was caused by "acute delirium" attributable to voluntary consumption of alcohol or mind-altering drugs. If the latter he would (with exceptions not claimed to be applicable to this case) be ineligible to be found not guilty by reason of insanity. *State v. Kolisnitschenko*, 267 N.W.2d 321, 324 (Wis. 1978); see Wis. Stat. § 939.42. And that is the only verdict Price seeks; he doesn't deny having mounted the machete attack and that it was a criminal attack unless it was caused by insanity.

Three medical experts testified at Price's trial: one chosen by the prosecution, who testified that the attack had not been the result of mental illness; one chosen by the defense, who testified that it had been; and the third, Dr. Robert Drom, appointed by the trial court to be the court's own expert witness, who testified that he had been unable to form an opinion though he thought that Price's symptoms were more like those of substance-induced acute delirium than of mental illness.

Price argues that his trial lawyer provided ineffective assistance by failing to show Drom certain evidence that might have persuaded him to testify that Price had been insane during his rampage. Wisconsin law permits a jury to reject an insanity defense by a vote of ten to two. Wis. Stat. § 971.165(2). Two jurors voted that Price was insane, so he was only one vote away from a mistrial.

Price's lawyer had obtained a number of police reports concerning the traffic accident and its violent aftermath, plus medical records documenting his client's history of mental illness before the attack, plus reports by private investigators who had interviewed family members and friends about his behavior before the attack. Most of the interview reports elicited observations made the morning of, or on the days before, the attack. But some of the interviewees reported that Price had been acting strangely for months; if true this would bolster the inference that the attack was the product of mental illness rather than of intoxication, which develops and clears rapidly. The lawyer gave some of this material to Dr. Drom but not all—not the reports by the lay ob-

servers, or the medical reports of Price's history of mental illness, or police reports of his continued crazy behavior after the attack when the police were trying to subdue him (and for two or three days afterward), or a toxicology report based on blood drawn from him after his arrest. Although the blood was tested too late to negate the possibility that Price's fit had been caused by drunkenness or by sudden cessation of drinking, it did negate the possibility that it had been caused by drugs such as PCP, cocaine, or amphetamines, which can also precipitate such behavior.

Drom had said in a letter to the trial judge that Price's violent outburst was "highly consistent with a substance induced psychosis," that "[Price's] description of the events and perceptions of the two days preceding [the attack] are consistent with a[n] acute psychotic episode," that "clarity might be shed upon this issue" if "urine samples [had] been taken for forensic purposes," and that "if reliable witnesses to [Price's] behavior in the . . . 48 hours [preceding the attacks] were available who[] might attest to his behavior, thought content, manner of speech and/or possible ingestion of street drugs on a voluntary or involuntary basis support for his claims of mental defect might be obtained." And in a conference with Price's lawyer Drom had said, according to the lawyer's notes, that the lawyer's "description of events [in the weeks preceding the attack] is consistent with an 'acute psychotic episode'" and that "corroboration," if forthcoming, would "show[] mental illness, and [that Price was] probably not mentally responsible for [his] actions." The notes also state that in answer to the

question whether Price was psychotic, Drom had said "Yes," and in answer to the further question what the source of the psychosis was had said "1) Drug induced. 2) Result of long-term alcoholism. 3) Possibly due to paranoia."

The lawyer gave Drom an oral summary of the private investigators' reports, which might have supplied the fuller "description of events" that Drom was seeking. But Drom testified at the trial that he was unwilling to offer an opinion on Price's mental condition "without first-hand hearing or seeing transcription of those witnesses." He speculated that Price's manic state might have been "acute delirium" caused by consumption of alcohol or drugs, though he did not exclude the possibility that it had been attributable to mental illness. He refused to offer any opinion about Price's mental state "to a degree of medical certainty."

At the state postconviction hearing, a new expert retained by the defense, Dr. John Marshall, testified that a psychiatric expert witness who had not had access to reports of the "observations of people close to [Price] just prior to this incident" would have been "severely handicapped" in rendering an opinion concerning Price's mental condition during the attack. Noting that eight witnesses had observed Price's deterioration over the weeks and months prior to his explosion, Marshall concluded that it was "not . . . even a close call" that the explosion was the "result of a mental illness." Dr. Drom did not testify or provide an affidavit in the postconviction proceeding; he had retired. The trial judge, now presiding

over the postconviction proceeding, refused to reappoint him as the court's expert and Price did not subpoena him to obtain his presence at the postconviction hearing, as he could have done. Left unanswered—and now, as we'll see, unanswerable—was whether Drom's opinion (or rather lack of opinion) about Price's sanity would have been altered had he seen the reports of the observers.

The Wisconsin court of appeals analyzed the issue of ineffective assistance as follows: "Price had not demonstrated any signs or symptoms of any significant mental disorder during his stay while being evaluated for competency. Also, trial counsel informed Dr. Drom of the pertinent eyewitness accounts of Price's behavior during the weekend before the crimes. Dr. Drom indicated at trial that those accounts did not change his inability to form an opinion since he could not determine the credibility of the behavioral observations. Giving Dr. Drom the actual reports would not have changed his testimony because he still could not assess the credibility of the reported observations. Finally, the claim that trial counsel should have presented evidence found in the police reports during the NGI [not guilty by reason of insanity] phase [of the trial] ignores the fact that during the first portion of the trial, the jury heard descriptions of Price's conduct, statements and behavior. Price's own expert [Dr. McDonald] explained how the observations of various people played a role in his determination that Price was NGI. Repetition of this evidence was not necessary." *State v. Price*, *supra*, 2002 WL 563375, at *5. The opinion does not mention Dr. Marshall's testimony or discuss whether a lawyer's

providing an expert witness with an oral summary of reports of fact witnesses is an adequate substitute for giving the reports to the expert to read for himself. The lawyer testified that his failure to respond to Drom's request for the reports was an error rather than a ploy.

We concluded in our first opinion that there was so much missing from the state appellate court's evaluation of the constitutional adequacy of Price's lawyer that we could not determine the reasonableness of that evaluation without asking the district court to take evidence on the matter. So we directed the district court to conduct an evidentiary hearing, explaining (with copious citations to the case law) that "when the merits of a petition for habeas corpus cannot be determined from the record compiled in the state court, through no fault of the petitioner (compare 28 U.S.C. § 2254(e)(2)), the district court is authorized, and may be directed by the court of appeals, to conduct its own hearing and make appropriate findings, here on whether Price's defense was prejudiced by the mistakes committed by his lawyer with regard to insanity." 514 F.3d at 733.

We had thought that when a petitioner who is seeking relief under section 2254(d)(1) (that is, when he is charging that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, in this case the doctrine of ineffective assistance of counsel) is unable to create a record adequate for determining the merits of his claim, the district court can hold an eviden-

tiary hearing to complete the record. That was the situation alleged by Pinholster and found by the Ninth Circuit in a decision recently reversed by the Supreme Court in *Cullen v. Pinholster*, 2011 WL 1225705 (U.S. Apr. 4, 2011). The Court ruled that with exceptions that were inapplicable to Pinholster's case and are inapplicable to Price's as well, a district court may not take evidence in a habeas corpus proceeding that is based on section 2254(d)(1): "evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of §2254(d)(1) on the record that was before that state court." 2011 WL 1225705, at *10. In light of that decision we should not have ordered such a hearing insofar as Price was seeking relief under section 2254(d)(1). (Price argues that his claim of ineffective assistance of counsel wasn't adjudicated on the merits, but that is not correct.)

As for a claim under section 2254(d)(2), which provides relief from a state court's decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," the statutory language appears to leave little or no room for an evidentiary hearing in the district court, because evidence presented in such a hearing would not alter "the evidence presented in the state proceeding," although we cannot be certain of this because the relation between subsections (e) and (d)(2) has never been authoritatively determined. See *Wood v. Allen*, 130 S. Ct. 841, 845 (2010); *Rice v. Collins*, 546 U.S. 333, 338-39 (2006); *Wiggins v. Smith*, 539 U.S. 510, 528 (2003); *Miller-El v.*

*Cockrell*, 537 U.S. 322, 348 (2003). No matter; even if we were right to order an evidentiary hearing, Price cannot prevail. The evidence presented at the hearing falls short of demonstrating a denial of effective assistance of counsel.

Three witnesses, all presented by Price, testified at the hearing: his trial lawyer, another lawyer (an expert on effective representation in insanity cases), and a psychologist. Drom did not testify; he had died. The district court concluded that Price's representation by his lawyer at trial had indeed fallen below professional standards but that the Wisconsin court had not been unreasonable in concluding that Price's defense had not been prejudiced by the lawyer's pratfall.

Prejudice is the only issue we need discuss; the state's contentions that the lawyer's withholding of documents from Dr. Drom was mere "inadvertence," which did not impugn the adequacy of his representation of Price, and that Price's lawyer had no duty to try to elicit a helpful opinion from Drom because Drom was not a defense witness, are unpersuasive.

Drom may not have realized that an expert witness is allowed to base the opinion to which he testifies on any materials on which he would base a diagnosis or other determination in his ordinary professional work, whether or not the testimony would be inadmissible if given by a nonexpert witness. Fed. R. Evid. 703. "[A]n expert is not limited to relying on admissible evidence in forming his opinion. That would be a crippling limitation because experts don't characteristically base their

expert judgments on legally admissible evidence; the rules of evidence are not intended for the guidance of experts. Biologists do not study animal behavior by placing animals under oath, and students of terrorism do not arrive at their assessments solely or even primarily by studying the records of judicial proceedings." *Boim v. Holy Land Foundation for Relief & Development*, 549 F.3d 685, 704 (7th Cir. 2008) (en banc) (citations omitted). Like other physicians, psychiatrists rely on statements and reports without worrying about whether they would be admissible in a trial. Price's lawyer should have pointed out to Drom that admissibility is an issue for the judge, not for the expert witness, and having done so should have shown Drom the witness statements, some dozen in number, and pointed out that they were consistent in their description of Price's abnormal behavior in the days preceding the attack, of the absence of indications of substance abuse during that period, and of his having been acting strangely for months—his personality had changed and he had seemed paranoid, nervous, angry, intense, and strange. Drom thought the psychotic episode substance-induced because he understood it to have appeared out of nowhere and cleared very rapidly, and the reports suggested otherwise.

It is true that Price had been drinking on the day of the attack. There were empty bottles in his truck and he admitted to one doctor that he had been drinking in the days before the incident and he told the hospital that he had been drinking for weeks and had a history of alcohol withdrawal. But his lawyer failed to show Drom

the police report of Price's continued crazy behavior (including an attempt to eat his dreadlocks) for 41 hours after his arrest—long after the alcohol would have left his bloodstream—and the absence of typical symptoms of delirium tremens (acute alcohol withdrawal).

Some of the witnesses to Price's behavior in the days before the attack testified at the trial, and their testimony was consistent with the investigator's reports of what they had told him, and more detailed. There is no indication that Drom attended any part of the trial, however, though he may have—the record is a blank on the question. But there is no contention that if Drom did not attend, Price's lawyer was culpable; Drom was the court's witness, not his.

A jury is likely to think the court's expert witness the most credible expert witness in the case. Had Drom been convinced that Price had been exhibiting signs of psychosis for a significant period before the attack without consuming alcohol in excess or (other) mind-altering drugs during that period, and had Drom been given the medical records that substantiated Price's long history of paranoid schizophrenia and the toxicology report which negated several possible explanations, alternative to insanity, for the attack, he might have agreed with Price's medical expert that the attack had been caused by insanity rather than by a binge. The witness at the evidentiary hearing that we ordered who was an expert on effective representation testified that "it appears as though [Drom] was searching for some corroborating information to establish that whatever

he found to be a deficiency in Mr. Price's mental condition at the time of the offense . . . wasn't a consequence of drug abuse." The documents that Price's lawyer inexplicably failed to give him contained such information.

The district court made two key findings on prejudice. The first was that "Dr. Drom was clear in his testimony that he believed it was necessary for him to be able to assess the credibility of the witness[es] in order to place any reliance on the witness[es]' recounting of Price's behavior. There is no evidence to indicate that rolling back a layer of hearsay by permitting Dr. Drom to review the actual reports rather than hearing [Price's lawyer's] recounting of the content of those reports would have changed Dr. Drom's inability to make a determination with the requisite degree of medical certainty. The reports of the private investigators and of the police would still have been hearsay, and thus, in the view of Dr. Drom, insufficient for his purposes." The second key finding was that "the toxicology report could not indicate whether Price was under the influence of alcohol at the time of the incident" and "would not have affected Dr. Drom's inability to reach a conclusion as to Price's status at the time of the incident."

Nevertheless as an original matter we would be inclined to rule that Price had been prejudiced by his lawyer's lapses. But the Wisconsin court of appeals disagreed; and a state court's determination that a defendant was not prejudiced by his lawyer's ineffectiveness is entitled to great weight in a federal habeas corpus proceeding, as emphasized with rather unexpected vigor

by the Supreme Court when it said recently that a state prisoner can prevail in a federal habeas corpus proceeding only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents . . . . [The] prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

In light of the *Harrington* decision we must give short shrift to Price's complaint that the Wisconsin court of appeals ignored a good deal of the evidence on which his claim for relief was based, such as his early medical records, the reports of treating physicians, and the report of the toxicology test. Vague language in the court's opinion may cover some or even all of this evidence; but of greater moment is the Supreme Court's ruling in *Harrington* that even a state court "opinion" consisting of the single word "affirmed" is entitled to the full deference that the habeas corpus statute demands be given determinations by state courts. *Id.* at 784-85. The Supreme Court's ruling precludes our inferring error from the Wisconsin court's failure to discuss particular pieces of evidence.

Nor did that court apply an incorrect standard for determining prejudice, which would be grounds for relief under section 2254(d)(1); see *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The correct standard is that the

defendant must demonstrate a reasonable probability that had it not been for his lawyer's ineffectiveness the outcome at trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Johnson v. Thurmer*, 624 F.3d 786, 791 (7th Cir. 2010); *Stephenson v. Wilson*, 619 F.3d 664, 671 (7th Cir. 2010). The Wisconsin court recited that standard but later in its opinion muddied the waters by stating that to prevail Price had to show that proper representation "would have altered the outcome of the case," *State v. Price, supra*, 2002 WL 563375, at *5, quoting *State v. Leighton*, 616 N.W.2d 126, 139 (Wis. App. 2000)—not would have created a reasonable probability of altering the outcome. But there is more to the quotation: "A defendant who alleges a failure to investigate on the part of his or her counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the case." *State v. Price, supra*, 2002 WL 563375, at *5. Whether that's right or wrong (right, if the word "probably" is understood before "would have altered," but we needn't decide), it doesn't bear on the key determination in the court's opinion regarding prejudice. That is found in a passage we quoted earlier: "trial counsel informed Dr. Drom of the pertinent eyewitness accounts of Price's behavior during the weekend before the crimes. Dr. Drom indicated at trial that those accounts did not change his inability to form an opinion since he could not determine the credibility of the behavioral observations. *Giving Dr. Drom the actual reports would not have changed his testimony because he still could not assess the credibility of the reported observations*." *Id.* (emphasis added).

Price argues that the Wisconsin court's finding (culminating in the italicized passage just quoted) that he was not prejudiced by the ineffective assistance of his counsel was based on a determination of facts that was unreasonable in light of the evidence presented to the state court—the ground for relief in 28 U.S.C. § 2254(d)(2); see *Wood v. Allen*, *supra*, 130 S. Ct. at 849; *Taylor v. Maddox*, 366 F.3d 992, 999-1001 (9th Cir. 2004). The unreasonable determination alleged is that the reports that Dr. Drom did not receive would not, had they been given to him, have persuaded him that Price had been mentally ill when he went on his rampage. The question is not whether Drom wanted the reports; he did; but, to repeat once again, the court determined that "giving Dr. Drom the actual reports would not have changed his testimony because he still could not assess the credibility of the reported observations."

Drom had testified that "without first-hand hearing or seeing transcription of those witnesses, I don't think I could do it [that is, offer an opinion on insanity] to a degree of medical certainty. *If that testimony is available and considered to be from reasonable and truthful witnesses by the Court*, I think I would have to leave that to the Court. I cannot make that statement definitively." The critical passage is the one we've italicized. It's not entirely clear what Drom meant (and we shall never know for certain), but it seems he wanted the judge to validate the reliability of the witnesses' testimony, which the judge could not have done.

A further exchange at the trial reinforces this interpretation:

>   *Prosecutor*: "Based upon the information that you had, would you say that the defendant is still responsible for his actions?"
>
>   *Drom*: "Without more specific information from the sources, I would have to say that he's responsible, because he's not proven otherwise." . . .
>
>   *Judge to prosecutor*: "Why don't you ask him simply does the additional information allow you to come to some other conclusion?"
>
>   *Prosecutor asks the question and Drom answers*: "I am having to rely on the vertical [veridical?] truthfulness of that information to make such a statement."
>
>   *Prosecutor*: "Do you have some hesitancy in relying upon the credibility of that information based upon the chain that it went through?"
>
>   *Drom*: "I think—I think that's a court decision."

Maybe at this juncture the judge should have recessed the trial to allow defense counsel to explain to Drom that an expert witness is not limited to basing his testimony on facts verified by a judge. Or maybe defense counsel should have explained that to Drom before the trial. But it would be speculation to conclude that his insistence on judicial validation of witnesses' testimony was based on a misunderstanding of the rules of evidence rather than on his own professional standards, possibly idiosyncratic. We cannot say that it was "unreasonable" for the Wisconsin court to infer from the evidence presented to it that Drom would not have changed his testimony had he read the reports, especially since the eye-

witnesses were all friends of Price and so might not seem credible to Drom. We might disagree with the Wisconsin court, but we would not have the strength of conviction that would enable us to declare its conclusion unreasonable. The evidence presented at the evidentiary hearing in the district court—if as we greatly doubt we are permitted to consider any of it—would not alter our conclusion, notably because of Drom's unavailability to testify at that hearing. We note finally that Price does not argue that the court's selection and handling of Drom as a court-appointed witness deprived Price of due process of law.

AFFIRMED.