In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3725

MELVIN NEWMAN,

*Petitioner-Appellee,*

*v.*

RICK HARRINGTON, Warden,

*Respondent-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:08-cv-04240 — **Robert M. Dow, Jr.**, *Judge.*

ARGUED MAY 29, 2013 — DECIDED AUGUST 9, 2013

Before BAUER, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Melvin Newman was convicted in
Illinois state court of first-degree murder of Andrew Dent and
sentenced to 47 years' imprisonment. Following affirmance of
his conviction and sentence on direct appeal, Newman filed a
state post-conviction petition, asserting three grounds for
relief, only one of which is relevant here. The Illinois Court of
Appeals affirmed the circuit court's dismissal of his petition,

with one justice dissenting, and Newman exhausted his state court remedies. Newman filed a federal habeas petition under 28 U.S.C. § 2254, alleging that his trial counsel rendered ineffective assistance in failing to investigate Newman's fitness for trial and failing to seek a fitness hearing. Newman contends that the state court's denial of his post-conviction petition resulted in a decision that unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. He also argued that the state courts' determinations of his fitness to stand trial were unreasonable given the evidence presented in the state court record.

The district court held an evidentiary hearing over several days and determined on the basis of the state court record that the state courts unreasonably concluded that Newman was not prejudiced by his counsel's failure to investigate his fitness to stand trial and bring the issue of his fitness to the trial court's attention. The district court also found that counsel's failures to investigate known deficiencies in Newman's mental capacity and to raise the fitness issue with the trial judge constituted ineffective assistance. Based on the entire record, including the evidence presented at the federal habeas evidentiary hearing, the district court determined that counsel's "performance fell below the constitutional minimum and that Newman was prejudiced by his counsel's performance because there is a reasonable probability that Newman would have been declared unfit to stand trial at a competency hearing." Therefore, the district court decided that Newman was being held in custody in violation of federal law and granted Newman habeas relief. The state appealed from that decision. Finding no error, we affirm.

## I. Background

*A. Newman's State Criminal Case*

In July 2001, Andrew Dent was shot and killed. The day after the shooting, the police went looking for Melvin Newman, then 16 years old. Within a few days, Newman, accompanied by his mother, Barbara Newman, turned himself in to the police and was arrested for Dent's murder. Newman's mother hired attorney Michael Johnson and during their first conversation told him that her son was a "special child" who attended a "school for the handicapped, the mental school." During their first meeting, she gave Johnson a two-inch-thick stack of educational and psychological records reflecting Newman's lengthy history of severe mental and cognitive deficits. The records included a diagnosis of mental retardation from the Social Security Administration, a school psychologist's report indicating that Newman's IQ was 62, and an Individualized Education Program report indicating that Newman read at a first-grade level.

Newman's case was tried by a jury in 2002. At trial, Newman had two colloquies with the trial judge. The first regarded his constitutional right to testify or not to testify. The judge advised Newman that if he did not testify, the jury would be instructed that they "should not draw any inference from that whatsoever." Newman's only responses during the colloquy were "Yes, sir" and "No, sir." Toward the end of the colloquy, the judge asked Newman, "And knowing all of this, your constitutional rights to testify and not testify and having discussed it with your mother and your attorney, what is your wish?" Newman responded, "No, sir." The judge restated the

question as "You don't want to testify, is that correct?" Newman again said, "No, sir." The second colloquy concerned whether Newman wanted a jury instruction on second-degree murder. Again, Newman's only responses to the judge's questions were "Yes, sir" and "No, sir." Newman was convicted and sentenced to 47 years' imprisonment. He appealed to the Illinois Court of Appeals, which affirmed. *People v. Newman*, No. 1-02-2615 (Ill. App. Ct. Mar. 31, 2004).

*B. State Post-conviction Proceedings*

The next year, Newman sought post-conviction relief in Illinois state courts, raising his claim of ineffective assistance of counsel. *See* 725 ILCS 5/122-1(a)(1). His petition was supported by a wealth of evidence, including the 2005 report of Antoinette Kavanaugh, Ph.D., a licensed clinical psychologist, who opined that Newman had cognitive deficits, specifically that he is moderately to mildly mentally retarded. She also opined that Newman had been unfit to stand trial. Kavanaugh reported that his "cognitive deficits are readily apparent" and "should have been apparent to anyone who attempted to have a conversation with [him] and posed questions to him that required more than a yes or no answer."

Kavanaugh's report was based on two clinical interviews with Newman over a two-week period in 2005, totaling about five hours. She also administered a series of psychological tests to Newman and reviewed his academic and psychological records, including his petition for post-conviction relief and exhibits. Intelligence testing revealed that Newman's full scale IQ was 54 and his intellectual abilities were in "the Extremely Low Range." His performance on word reading, mathematics

reasoning, reading comprehension, and listening comprehension placed him in the less than 0.1 percentile for each academic area. Specifically, Newman's word reading skills were equal to the average skills of a 7-year-old; his reading comprehension skills were equal to those of someone who is not yet 6-years old; his listening comprehension skills were equal to someone age 4 years and 8 months; and his mathematics reasoning abilities were equal to those of a 5-year-old. Based on his performance on a "Digit Span" test, Kavanaugh believed that Newman was not feigning his cognitive deficits.

Kavanaugh also interviewed Newman's mother and Katherine Daphne Whitington, a reading specialist who had worked with Newman one-on-one while he was at the juvenile-detention center at the time of his trial. Whitington advised Kavanaugh that Newman had "profound reading disabilities" and couldn't tell time. Whitington stated that he "can't deal with vaguely abstract concepts," for example, he didn't know what "word" was. She said that "it was most evident to [her] that [Newman] didn't understand things … when he was talking … about his case. He had no clue and it was obvious that he had no clue." Whitington also said that Newman "has a horrible memory" and sometimes had problems recalling what he did five minutes earlier. Newman's mother informed Kavanaugh that at the time of trial, Newman could not write his name and was still wetting the bed. Newman's mother also reported that he did not ask her many questions about what was going on in the case. When he did ask questions, however, they suggested to her that he didn't understand why he was there and what was happening in court.

Kavanaugh determined that Newman was not currently fit to stand trial and would not have been fit to stand trial at the time of the proceedings. She explained that he did not understand basic legal concepts such as "witness" and "evidence" and did not understand the roles of the state attorney, defense attorney, judge, or jury. Kavanaugh observed that he "consistently demonstrated difficulty retaining what he had been told over the course of the evaluation related to fitness." She believed that his inability to recall information "would have significantly interfered with his ability to assist in his defense and [to] understand the nature and purpose of the proceedings." His lack of understanding of the proceedings was evidenced by his failure to understand his sentence. She also reasoned that his concrete and simplistic thinking prevented him from making various legal decisions to assist in his defense. Thus, in Kavanaugh's clinical opinion, Newman could not and was not able to assist in his own defense. Finally, she did not think that he could be restored to fitness within one year.

Newman's post-conviction petition was supported by numerous other records and affidavits, which reflected his history of cognitive deficits. For example, a 1995 Social Security Administration report found him eligible for disability benefits due to mental retardation. A July 2000 Chicago Public Schools psychological evaluation report indicated that Newman's IQ was 62 and that this along with his reading and math skills ranked in the first national percentile. A 2003 psychological report from Macon Corrections (within Menard Correctional Center) stated that Newman's IQ was 65 even though he put forth his "best effort" during testing. The report also noted that

he could not tell time and had problems counting money and making change. Special education teacher June Randall, who taught Newman in 2000-2001, stated in her affidavit that Newman was "a truly mentally retarded student" who "was very slow to learn" and had "the most trouble understanding complex or abstract concepts." According to Randall, he needed to have such concepts explained to him in "very simple, concrete steps" or he would not grasp them. Similarly, Whitington stated in an affidavit that in 2001 and 2002, Newman was a "non-reader" with "memory problems" who "struggle[d] to understand abstract concepts." She added that when she "spoke with Melvin about his case … it was obvious that he did not know what was going on, especially when [she] would ask him questions that required more than a 'yes' or 'no' answer." Newman's own affidavit signed in 2004 stated, *inter alia*, that he had difficulties in school and that other kids laughed at him when he could not answer the teacher's questions. Newman's mother stated in an affidavit that before trial she gave Johnson a stack of medical records, psychological evaluations, and school evaluations, all regarding Newman's disability.

The trial court denied Newman's petition without an evidentiary hearing, and Newman appealed to the Illinois Appellate Court. That court, with one dissenting justice, affirmed. It concluded that Newman "has failed to demonstrate that a *bona fide* doubt as to his fitness to stand trial existed at the time of trial." *People v. Newman*, No. 1-06-1977, slip op. at 10 (Ill. App. Ct. Sept. 4, 2007). The state appeals court briefly (and selectively) mentioned a few of the exhibits attached to Newman's post-conviction petition: 1998 and 1999

psychiatric assessments from Hartgrove Hospital; the Chicago Public Schools July 2000 psychological evaluation report; the 2003 psychological report from Macon Corrections; a July 2002 social investigation by the juvenile-court probation officer; and Kavanaugh's report. The court found that Newman's allegations "[a]t most … establish[ed] that he has limited intellectual ability, but do not speak to his fitness to stand trial." *Id.* at 9. It also found that the record "do[es] not indicate that [Newman] was anything other than academically challenged and a slow learner," and "does not indicate that his demeanor during trial was inappropriate, and at all times he responded appropriately to questioning by the trial court." *Id.* at 10. In making these determinations, the court concluded that Kavanaugh's report was "irrelevant in terms of considering whether [Newman] was unfit at the time of trial because the evidence must be considered in light of the facts known at the time of trial." *Id.* at 11. The court only addressed prejudice; it did not address whether counsel's performance was deficient.

### C. Federal Habeas Proceedings

Following the denial of his state petition for post-conviction relief, Newman filed a federal habeas petition under 28 U.S.C. § 2254 in the district court. The district court held an evidentiary hearing over several days in early 2011 at which Newman, Johnson, Newman's mother, Whitington, Kavanaugh, and the state's expert, psychiatrist Stafford Henry, among others, testified.

Whitington testified that when Newman approached her for help with reading while he awaited trial in 2001, he "could not read at all" and he could recognize "some letters but not

consistently." Whitington worked with Newman about 45 to 60 minutes per day, five days a week, year round, yet Newman's progress was slow. He retained "very little" of what she taught him. "[T]hings that he seemed to have mastered the day before, he would have forgotten by the next day." His progress "was slower than that of "almost any other student" of Whitington's. At the time of his conviction in 2002, Newman read only at the kindergarten level. When Whitington tried to talk with him about basic abstract concepts, he "would get lost."

Daniel Dillon, a 25-year special education teacher who taught Newman at the juvenile-detention center "testified credibly," according to the district court, that Newman was "one of the lowest students" that he had ever taught. Newman worked hard to learn but nonetheless after one year he still could not read, spell a four-letter word, or write a sentence without copying it. Dillon stated that when Newman learned basic things like how to spell "cat," he would immediately forget them. The last day of class, Newman said, "I wish you would put the ABCs on the board because I don't know my ABCs"—Dillon had not heard anyone say that before. Based on their daily interactions in 2002, Dillon did not believe that Newman was able to understand concepts like "constitutional right to testify," "inference," "consulting," and "second degree murder jury instruction"—even if they were explained to him.

A special-education teacher at Menard Correctional Center, Jerry South, testified that in 2004, Newman was illiterate and could not tell time or do basic arithmetic. South agreed with a Department of Corrections' educational assessment of Newman as mentally retarded. According to South, Newman

had made "substantial progress" in class at Menard such that in 2008 he was he was reading at a sixth-grade level.

Newman's mother testified that before trial, she handed Johnson a 5-inch stack of papers on her son's mental disability, including the documents attached to the state-court post-conviction petition. When asked how high the stack of papers she had collected on Newman's disability and given to Johnson was, the record reflects that she said, "About like this" and made a gesture indicating the height. Counsel stated that she demonstrated a height of about 5 inches, and the court said, "Looks right to me." However, the court apparently gave the state the benefit of any doubt as to exaggeration of the thickness of the papers and found that Newman's mother gave Johnson a 2-inch thick stack of records. Newman's mother also stated that Newman's disability is that he is "retarded" and she "hate[s] that word." She prefers to call him "special." She testified about the problems Newman had in school and in learning to read. The district court found that many of the facts about which she testified were corroborated by independent sources, although it viewed her testimony with caution because she was Newman's mother.

Newman also testified at the evidentiary hearing. Based on the "opportunity to observe [him] in person during the evidentiary hearing—and especially during his testimony," it was evident to the district court that "Newman's mental acuity is noticeably lower than any other witness who has testified at any proceeding over which the undersigned judge has presided."

Johnson testified that at the time of Newman's trial, he represented as many as 75 clients. Johnson said that when he began reviewing the documents Newman's mother had given him, he had "some concerns" that Newman might be unfit. But after reviewing everything and talking to Newman, he "no longer had those concerns." In Johnson's opinion, Newman's problem was either attention deficit disorder (ADD) or attention deficit hyperactive disorder (ADHD), which was causing him difficulty in intelligence testing. Johnson claimed that Newman assisted him in preparing for trial by identifying photographs of his neighborhood. Johnson believed that Newman's Global Assessment Functioning (GAF) score of 55 out of 100 was "not bad" and "pretty good." However, according to Kavanaugh, that score reflects "significant impairment" and is typical of someone with mental retardation. Johnson also testified that he thought Newman was fit because Hartgrove Hospital records did not indicate a concern with a mental impairment or mental retardation and he knew Newman had been enrolled in the Lincoln's Challenge program, which Johnson believed would not accept mentally retarded kids. (Newman's mother had filled out her son's application to the program; she did not indicate that he was retarded.)

Kavanaugh testified at the evidentiary hearing consistent with her report that Newman had been unfit to stand trial in 2002. In contrast, a psychologist hired by the state in 2010, Stafford Henry, testified that Newman was fit to stand trial. In his view, Newman understood the nature and purpose of the proceedings against him. This was based on the fact that Newman knew he had a lawyer whose job was to help him;

Newman had said "the guys in suits were against me" and were "mean to me"; and Newman was aware that "the judge was present at trial, that he is in charge of the courtroom." Kavanaugh, however, testified that this indicates only that Newman was reporting what he saw in the courtroom, not that he actually understood what was happening. Henry also concluded that in 2002 Newman was able to assist in his own defense. This opinion was based on a claimed lack of evidence of a cognitive defect to the contrary, and Newman's statement that he spoke with his lawyer and said "he didn't do it," as well as Johnson's deposition testimony that he went over aspects of the case with Newman and had no difficulty communicating with him. Henry thought Newman was malingering. He interviewed Newman only once and for less than two hours. Henry did not administer any tests and he did not interview anyone who knew Newman at the time of trial. Nor did he offer any reason for disregarding the numerous reports that clearly indicated Newman had a history of serious mental deficits.

The district court granted the petition, finding that the state appellate court had unreasonably determined the facts and unreasonably applied *Strickland* in holding that Newman had not shown prejudice from counsel's ineffectiveness. The district court also determined that Newman was in custody in violation of the Constitution or laws of the United States based on his satisfaction of both prongs of *Strickland*: (1) Johnson's performance was deficient when he failed to conduct a further investigation and seek a fitness hearing; and (2) crediting Kavanaugh's testimony over Henry's, Newman proved there

was a reasonable probability that he would have been found
unfit to stand trial. The state appealed.

## II.  Discussion

The state argues that in finding that the Illinois appellate
court unreasonably applied *Strickland* and unreasonably
determined the facts, the district court failed to accord appro-
priate deference to the state court's decision and erroneously
evaluated the state court's judgment denying post-conviction
relief. We disagree. The district court was appropriately
deferential to the state court's determinations. Nonetheless, the
state record contains compelling evidence that the state court's
denial of post-conviction relief involved an unreasonable
application of *Strickland* and was based on an unreasonable
determination of the facts. The state also contends that
Newman is not entitled to habeas relief. We disagree with that
position as well: Johnson's failure to investigate Newman's
fitness and request a fitness hearing was constitutionally
deficient, and based on the entire record, there is a reasonable
probability that Newman would have been found unfit to
stand trial.

When reviewing the district court's decision on a habeas
petition, we review its factual findings for clear error and its
legal conclusions de novo. *Crockett v. Hulick*, 542 F.3d 1183,
1188 (7th Cir. 2008). Where a state court adjudicated the
petitioner's claim on the merits, the Antiterrorism and Effective
Death Penalty Act of 1996 ("AEDPA") prohibits a federal court
from granting habeas relief unless the state-court adjudication
"resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence" before the state court. 28 U.S.C. § 2254(d)(1)–(2). A federal court's review of a state court's decision under § 2254(d) is limited to the record before the state courts. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). Newman contends that the state court's adjudication resulted in a decision that involved an unreasonable application of clearly established federal law and was based on an unreasonable determination of fact.

Federal habeas courts are generally "limited to a deferential review of the reasonableness, rather than the absolute correctness, of a state court decision." *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012) (citation omitted). Under § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (quotation and citation omitted). "A state court decision is an 'unreasonable application of … clearly established Federal law' when the court applied Supreme Court precedent in 'an objectively unreasonable manner.'" *Warren v. Baenen*, 712 F.3d 1090, 1096 (7th Cir. 2013) (quoting *Brown v. Payton*, 544 U.S. 133, 141 (2005)). A "state prisoner must show that the state court's ruling on the claim … was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 131 S. Ct. at 786–87. Under § 2254(d)(1), "we presume that the courts' factual determinations are correct unless [Newman] rebuts the presumption by clear and convincing evidence." *Taylor v. Grounds*, No. 12-2632, 2013 WL 3336716, at *7 (7th Cir. July 3,

2013) (citing 28 U.S.C. § 2254(e)(1)). This standard is demanding, but not insurmountable. *Id.* As for § 2254(d)(2), federal courts conclude that a state court decision was based on an unreasonable determination of the facts "if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Id.* (quotation and citation omitted).

Newman's ineffective-assistance-of-counsel claim is analyzed under *Strickland*'s familiar two-part test. First, Newman "must show that counsel's performance was deficient," *Strickland*, 466 U.S. at 687, that is, it "fell below an objective standard of reasonableness," *id.* at 688. Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Newman also must show that counsel's deficient performance prejudiced his defense, that is, his "errors were so serious as to deprive [Newman] of a fair trial, a trial whose result is reliable." *Id.* at 687. Under this test, Newman "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When a habeas petitioner challenges a state court's application of *Strickland* under § 2254(d), our review is "doubly" deferential. *Harrington*, 131 S. Ct. at 788.

"'Counsel has an obligation either to investigate possible defenses or make reasonable decisions that particular investigations are unnecessary.'" *Warren*, 712 F.3d at 1100 (quoting *Burt v. Uchtman*, 422 F.3d 557, 566 (7th Cir. 2005)). The test for fitness or competency to stand trial is "whether [the defendant]

has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). This standard comports with the standard under Illinois law. *See* 725 ILCS 5/104-10 ("A defendant is presumed to be fit to stand trial … [and] is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense."). Where, as here, a petitioner alleges ineffective assistance because of counsel's failure to investigate and request a fitness hearing, "'we have interpreted the *Strickland* prejudice inquiry as asking whether there is a reasonable probability the defendant would have been found unfit had a hearing been held.'" *Warren*, 712 F.3d at 1100 (quoting *Burt*, 422 F.3d at 567); *see also People v. Johnson*, 794 N.E.2d 294, 306 (Ill. 2002) ("To establish the prejudice prong of the *Strickland* test, a defendant must show that the facts that would have raised a *bona fide* doubt of his fitness for trial existed at the time of his trial … ." (citations omitted)). Thus, to prevail under § 2254(d), Newman must show that the state court's determination that there was no reasonable probability of a different result was unreasonable. *See Harrington*, 131 S. Ct. at 785, 792.

### A.  The State Court Unreasonably Applied Strickland

Newman alleges that his trial attorney Johnson rendered ineffective assistance when he failed to investigate an obvious issue regarding Newman's fitness to stand trial and failed to request a fitness hearing. The Illinois appellate court did not address *Strickland*'s performance prong but concluded that

Newman could not establish prejudice because he could not raise a *bona fide* doubt that he was unfit to stand trial. In doing so, the state court deemed Kavanaugh's report "irrelevant in terms of considering whether [Newman] was unfit at the time of trial because the evidence must be considered in light of the facts known at the time of trial." This determination is an unreasonable application of S*trickland* under § 2254(d)(1).

The fact that Kavanaugh's clinical evaluation of Newman occurred three years after his trial does not render her report irrelevant. We have said that "the mere passage of time may not make [a retrospective competency hearing] meaningless. The passage of even a considerable amount of time may not be an insurmountable obstacle if there is sufficient evidence in the record derived from knowledge contemporaneous to trial." *United States ex rel. Bilyew v. Franzen,* 842 F.2d 189, 193 (7th Cir. 1988) (alteration in original) (quotation and citation omitted). A state court's decision that completely disregards an expert's opinion as to the defendant's fitness at the time of trial involves an unreasonable application of the *Strickland* standard. *See Burt*, 422 F.3d at 570 (state court failed to mention expert's opinion that defendant did not comprehend legal advice and completely disregarded another expert's opinion that defendant's history warranted a competency hearing).

As Newman notes, for persons like him, who suffer from chronic mental disorders, retrospective evaluations are particularly appropriate "because there is more likely to be considerable documentation of their mental functioning over time." Robert D. Miller & Edward J. Germain, *The Retrospective Evaluation of Competency to Stand Trial*, 11 Int'l J.L.& Psychiatry

113, 122 (1988). The state court apparently overlooked that Kavanaugh's report was retrospective—she opined as to Newman's fitness at the time of trial as well as at the time she met with him. Furthermore, Kavanaugh's opinion was based in part on her interviews of people who knew Newman well at the time of trial and could provide information regarding his abilities and fitness at that past, critical time. Kavanaugh considered facts known at the time of trial such as Newman's extensive educational and psychological records as well. The state speculates that it is difficult to tell how Newman's mental state might have been affected by three years of incarceration, but Kavanaugh concluded that her view of Newman's then-current mental abilities was consistent with records and evidence regarding his abilities and deficits at the time of trial, and indeed, even before that time.

The state suggests that Newman may have presented himself in a light that would increase his hopes of having his conviction overturned. However, "a defendant cannot readily feign the symptoms of mental retardation." *People v. Shanklin*, 814 N.E.2d 139, 144 (Ill. App. Ct. 2004). Kavanaugh tested Newman for malingering and concluded that he was not. In addition, her consultation with Newman's mother and former teacher Whitington convinced her that his presentation was consistent with his past behavior. Further, a comparison of Kavanaugh's evaluation of Newman and his abilities demonstrates consistency with the numerous school and psychological reports on Newman gathered over the years. It would be unreasonable to think that Newman began faking symptoms of mental retardation before he was 11-years-old, leading to the creation of documentation 2-inches thick reflecting his mental

deficits just to "use his manufactured retardation to confuse the justice system." *Id.*

Kavanaugh's expert opinion was well-supported and relevant. It was consistent with the numerous reports from psychological and educational experts over many years (about a decade) leading up to trial and after. The state appellate court's decision to find Kavanaugh's report irrelevant was an unreasonable application of *Strickland*.

*B. The State Court Made an Unreasonable Determination of the Facts*

In addition, the state court's decision to deny Newman's post-conviction petition was based on an unreasonable determination of the facts in light of the state-court record. The state court unreasonably determined that Newman was nothing "other than academically challenged and a slow learner." This factual determination is quite troubling. It ignores Kavanaugh's expert report and most of the other evidence in the record that establishes that Newman's cognitive deficits run far deeper than that. Indeed, the clear and convincing evidence demonstrates that Newman is mentally retarded. By ignoring Kavanaugh's key expert evidence that Newman was moderately to mildly mentally retarded, the state appellate court's application of *Strickland* was unreasonable and its factual determinations as to Newman's mental limitations and fitness were also unreasonable. *See, e.g., Julian v. Bartley*, 495 F.3d 487, 494 (7th Cir. 2007) (state court's factual determination was against the clear and convincing weight of the evidence where it ignored key evidence). The state replies that the state court did not "ignore" the report, but simply

chose not to rely on it. This is a distinction without a difference, and the state court's rationale for disregarding the report does not withstand scrutiny even under our deferential review.

We fail to see how Kavanaugh's opinion that Newman was not fit to stand trial in 2005 or in 2002 and that he would not be restored to fitness within one year from the time of trial was undercut by Newman's 2004 affidavit, stating that he was "*starting* to understand" the legal concepts about which the trial court had questioned him. Putting aside the fact that it was not until 2004—three years after trial—that Newman was "starting to understand" legal concepts (it is unsurprising that even a mentally retarded person would make some intellectual progress over time), the state fails to appreciate the difference between beginning to understand an abstract concept and actually comprehending it. Besides, in his affidavit, Newman repeatedly asserts that he "did not understand" concepts such as "the difference between first- and second-degree murder" and that he "did not really understand what was happening at the trial." He also states that "if I understood … [some of the words used during the trial] better at the trial I would have been able to understand the questions that the judge asked me." These statements in Newman's affidavit actually weaken the state's position that the affidavit undercuts Kavanaugh's opinion that Newman would not be restored to fitness within one year.

The state argues that the state-court record demonstrated that Newman was "an angry, disobedient, violent teenager whose difficulties with learning stemmed from chronic truancy, learning disabilities, and his refusal to try." Notwith-

standing any other problems Newman may have had, the fact remains that clear and convincing evidence in the state court record establishes that Newman is mentally retarded and his mental retardation adversely affected his fitness to stand trial. The state also ignores the evidence in the record supporting the conclusion that at least some of these other problems were caused by Newman's significant cognitive deficits. As noted in the July 2000 social assessment by the Chicago Public Schools, teachers reported that "most of [Newman's] behavior concerns were initiated by his inability to read and complete assignments (i.e. difficulty learning new things, easily frustrated with both home and school work … and disrupting the class to avoid doing classroom assignments)." And notwithstanding his frustrations with his inability to perform academically, most of the trained professionals, psychologists and teachers, reported that Newman "put forth his best effort" and "worked hard."

The problem is not that the state court failed to cite the exact documents that the district court cited, or that the state court did not discuss a particular piece of evidence, or even "a good deal of the evidence" that supports Newman's claim. *Cf. Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011) (stating that *Harrington* "precludes [a federal habeas court from] inferring error from the [state] court's failure to discuss particular pieces of evidence"). Rather, here, as in *Burt*, the state court's analysis "ignored a wealth of evidence that established a reasonable probability [Newman] would have been found [unfit] to stand trial had a hearing been held. 422 F.3d at 570 (citing *Eddmonds v. Peters* 93 F.3d 1307, 1317 (7th Cir. 1996)). Indeed, the state court ignored the clear and convincing weight of the evidence,

resulting in a decision based on an unreasonable determination of the facts. *See, e.g.*, *Julian*, 495 F.3d at 494.

We highlight just some of that evidence here. The state court completely ignored the Social Security Administration's determination in 1995 that then-11-year-old Newman was eligible for benefits on the basis of mental retardation. The state court also completely ignored the Randall affidavit, which corroborates the diagnosis of mental retardation and confirms Newman's limitations in understanding abstract concepts. Whitington's affidavit, which also describes Newman's limitations with abstract concepts, specifically states that it was "obvious that he did not know what was going on" with his criminal murder case. As noted, Randall taught Newman special education in 2000–2001 and Whitington taught him in 2001, so their observations and assessments are contemporaneous to the trial. Furthermore, the state court failed to mention that the Individualized Education Program ("IEP") created in 2000 for Newman indicated that he demonstrated difficulties in all but two of the learning characteristics. These included "processes information slowly," "has a short auditory attention span," and "had difficulty understanding concepts." The IEP recommended all but one of the listed accommodations, including "explain directions and give concrete examples," "test one concept at a time," and "provide visual aids."

The state court also unreasonably determined that Newman "at all times … responded appropriately to questioning by the trial court." First, the evidence establishes that "yes, sir" and "no, sir" were the extent of Newman's responses to the trial court's questioning. He never gave more than a two-word answer and his simplistic answers do not suffice to show that

he understood the questions regarding his defense rights. And Newman's responses to the trial court's questioning were not at all times appropriate. During one colloquy the trial judge asked Newman if he understood his constitutional rights to testify and not to testify, and asked "knowing all of this … what is your wish?" Newman responded, "No, sir." This nonresponsive answer lends support to the conclusion that Newman was unable to understand the proceedings against him and assist in his defense.

In sum, the state court's denial of Newman's petition was based on an unreasonable determination of the facts in light of the evidence presented. The state court did not address *Strickland*'s first prong—deficient performance. Thus, as the state concedes, the district court properly evaluated that prong de novo, and it found that Johnson's performance in failing to investigate Newman's fitness and seek a fitness hearing was constitutionally deficient. *See Quintana v. Chandler*, No. 12-3125, 2013 WL 3800289, at *3–4 (7th Cir. July 23, 2013). We will address the performance prong in the next section, well aware that the § 2254(d) issue is based only on the record before the state court, but the question of whether Newman is entitled to habeas relief also takes into account the evidence presented at the evidentiary hearing before the district court. *See Mosley*, 689 F.3d at 841–42, 853–54.

*C. The District Court Correctly Determined that Newman is Entitled to Habeas Relief*

Having decided that the state court's decision denying post-conviction relief violated § 2254(d)(1) and (2), we assess whether the district court correctly determined that Newman

is entitled to habeas relief. *See Mosley*, 689 F.3d at 853 (noting that there are two separate inquiries under § 2254(d) and §2254(a)); *see also Quintana*, 2013 WL 3800289, at *3 ("Although a state court decision that stems from an unreasonable application of federal law will usually meet § 2254(a)'s requirement … this court will engage in de novo review after a finding of unreasonableness to answer the 2554(a) question as if the state court never reached the merits."). We, like the district court, consider the evidence presented at the federal evidentiary hearing. *See Quintana*, 2013 WL 3800289, at *3.

The state argues that Newman failed to show that counsel's performance was deficient or that, had counsel requested a fitness hearing, there was a reasonable probability that Newman would have been found unfit to stand trial. Yet even if we were to consider only the evidence in the state-court record, we would conclude that trial counsel's performance in failing to investigate Newman's fitness and seek a fitness hearing was constitutionally deficient and prejudiced Newman. The evidence adduced at the federal evidentiary hearing further corroborates that conclusion.

Very early in the criminal proceedings, Newman's mother handed Johnson a two-inch stack of psychological and educational records concerning Newman's history of cognitive deficiencies. The records included a diagnosis of mental retardation from the Social Security Administration; a Chicago Schools psychological evaluation indicating that Newman's IQ was 62 and that this score as well as his reading and math skills ranked in the first percentile nationally; and an IEP report indicating that Newman read at a first-grade level despite being sixteen years of age. Furthermore, the evidence estab-

lishes that Newman's cognitive limitations would have been apparent to Johnson from interacting with Newman. Kavanaugh testified that Newman's deficits would have been obvious, and Whitington stated that it was evident that he did not understand what was going on with is criminal case—"He had no clue and it was obvious that he had no clue." The district court even found Newman to have the least mental acumen of any witness that had testified before it. Johnson's failure to investigate the apparent problems with Newman's mental condition and fitness for trial constitutes deficient performance under *Strickland*. *See Burt*, 422 F.3d at 568–69 ("The failure by defense counsel to investigate apparent problems with a defendant's mental health may be deficient performance as defined by the first prong of *Strickland*." (citations omitted)); *Brown v. Sternes*, 304 F.3d 677, 692 (7th Cir. 2002) ("[W]here it will be apparent … from conversation with the defendant, or from other sources of information not requiring fresh investigation, that the defendant has some mental or other condition that will repay further investigation … then the failure to investigate will be ineffective assistance." (quotation and citation omitted)).

According to the state, however, the district court erred in assuming, without supporting evidence, that Johnson did not spend enough time with Newman to assess his mental state or perform the basic investigation necessary to determine whether to request a fitness hearing. But the district court did not simply assume this fact; the court drew this reasonable inference from the evidence. This evidence included Kavanaugh's testimony that Newman's deficits would have been obvious, the stack of records demonstrating his mental

deficiencies (a review of which we agree would raise red flags about Newman's fitness for trial), the high volume of cases that Johnson was handling at the time of Newman's trial, and the lack of any notes or specific recollection by Johnson to show what investigation he may have conducted. The record simply does not bear out the state's claim that "[t]he amount and extent of the information that Johnson received from [Newman] further supports Johnson's testimony that he met with [Newman] extensively."

The state argues that Johnson had represented a number of defendants with mental deficits similar to Newman's and was thus qualified to determine whether Newman understood him and the nature of the proceedings. However, the evidence is that Johnson thought a GAF score of 55 was "pretty good"; it isn't. The expert evidence establishes that such a score reflects "significant impairment" and is typical of someone with mental retardation. Similarly, Johnson's belief that Newman suffered from ADD or ADHD and was not mentally retarded runs head on into the wealth of evidence in the record that Newman was and is mentally retarded.

Furthermore, the evidence supports the reasonable inference that the conversations Johnson had with Newman would not have calmed concerns about Newman's fitness. Identifying a few houses in one's neighborhood is not the kind of assistance that demonstrates fitness. And, contrary to the state's representation that Newman identified witnesses for Johnson (other than Newman's girlfriend's brother whom Johnson determined wouldn't help but would hurt the defense), it was Johnson who identified the state witnesses for Newman and explained to him what they were going to say. Hr'g Tr. 515 ("I

would explain to him and tell him what the witnesses were going to say, who the witnesses were …") The state criticizes Newman, who is mentally retarded, and his mother for not telling Johnson that Newman did not understand what was happening. Even assuming they did not, as noted, it should have been clear to Johnson that Newman did not understand the proceedings against him. Newman's inability to respond appropriately to the trial court's questioning about his constitutional rights to testify or not to testify is yet one example of how Newman did not understand what was going on around him. An inability to understand this basic constitutional right further suggests that Newman was unable to assist in his own defense.

Johnson's knowledge that Newman had a prior juvenile conviction (resulting from a guilty plea) and had been admitted to the Lincoln Challenge program was insufficient to alleviate any concerns as to Newman's fitness. Johnson didn't know the particulars of the prior juvenile case, including whether there had been a concern over Newman's fitness at that time. If Newman simply had been asked yes/no questions in his juvenile case, his lack of understanding of the proceedings could have been overlooked. In any event, the question facing Johnson was whether Newman was fit at the time of Johnson's representation in the murder case. Even if Johnson understood that the Lincoln Challenge program would not accept a mentally impaired individual, there is no evidence that he knew whether or not the program had been informed that Newman was mentally retarded. (A review of the application to the program would reveal that Newman's mother did not state that he had a mental handicap.)

The state maintains that the district court did not afford counsel the presumption of competence. That is incorrect. But the presumption only goes so far. When the evidence overwhelmingly establishes that counsel should have investigated Newman's fitness to stand trial and raised the issue with the trial court, but failed to do so, the presumption is rebutted. Johnson's testimony that obtaining a fitness examination was a relatively easy process weighs against any argument that his failure to request a fitness examination was effective assistance. We agree with the district court that Johnson had a duty to investigate the obvious problems with Newman's mental condition and fitness for trial and a duty to request a fitness hearing. Thus, his failure to do so constitutes deficient performance under *Strickland*.

As for *Strickland*'s prejudice prong, the state argues that the state-court record shows that there was no reasonable probability that the Illinois courts would have found Newman unfit. To be sure, Newman's low IQ alone might not show him to have been unfit. But as Kavanaugh explained, his mental abilities (or deficits) could contribute to a lack of fitness. Moreover, as our prior discussion of the record demonstrates, the wealth of evidence, including Kavanaugh's report and testimony, establishes that at the time of trial Newman could not understand the nature and purpose of the proceedings against him.

The state argues that the district court erred in crediting Kavanaugh's opinions over Henry's. It challenges her experience, as compared to his. But the district court properly weighed the testimony and we find no clear error in its decision to credit her testimony. As noted, Kavanaugh's

evaluation of Newman's fitness was based on two interviews that totaled about five hours. She reviewed the numerous records and reports regarding Newman's mental limitations and she consulted others who had contact with him at the time of trial. She performed several tests on Newman as well, including the "Digit Span" test to assess him for malingering. Henry, in contrast, did none of these things and interviewed Newman only once. And that interview occurred more than eight years after his trial, whereas Kavanaugh interviewed Newman three years after trial. Henry's view that Newman was malingering is the only such opinion in the record. Over and over, teachers and psychologists such as South stated their belief that Newman had severe cognitive limitations and, despite them, gave his best effort. The state maintains that Kavanaugh had an erroneous view of the fitness standard, but both her written report and testimony at the evidentiary hearing dispel any such concern. And her opinion that Newman could not understand the proceedings against him was consistent with Whitington's and South's testimony. In addition, Kavanaugh explained that Henry's opinion that Newman understood the proceedings was based on Newman's testimony about what he had seen rather than on an understanding or appreciation of the roles of trial participants, the judge, attorneys, witnesses, and jury.

The state, like the appeals court, points to the juvenile-investigation report, which does not indicate that Newman had any difficulty answering questions but contains statements from his mother that suggest he was fit. But this is just one assessment among many others that suggest that Newman had difficulties with comprehension and fitness issues. Further,

Newman's situation is unlike that of the petitioner in *Young v. Walls*, 311 F.3d 846 (7th Cir. 2002). Like Newman, Young had serious mental deficits including a low IQ. However, Young had a greater ability to understand the proceedings against him. *See id.* at 849–50 (noting that Young knew that a "PD" was a public defender and knew the purpose that a trial serves).

Not only did the evidence establish that at the time of trial Newman could not understand the nature and purpose of the proceedings against him, it also established that he could not assist in his own defense. The meager assistance that Johnson says Newman gave him, such as identifying houses in his neighborhood and identifying his girlfriend's brother as a possible witness (one whom Johnson believed wouldn't help but would hurt the defense), does not constitute meaningful assistance. *See Dusky*, 362 U.S. at 402 ("[I]t is not enough for … the defendant … [to have] some recollection of events … ."). A defendant's role in assisting counsel in his own defense is to "recognize and relat[e] relevant information to counsel and make the few trial-related decisions reserved for defendants (i.e., whether to plead guilty, whether to request a jury trial, whether to be present at trial, and whether to testify)." *Watts v. Singletary*, 87 F.3d 1282, 1288 (11th Cir. 1996); *see also United States v. Salley*, 246 F. Supp. 2d 970, 979–80 (N.D. Ill. 2003) (finding defendant who "lacks the competence to make rational choices about fundamental decisions such as whether to waive his right to counsel, to plead guilty, to confront the witnesses against him through cross-examination, or to testify in his own defense" is unable to assist properly in his defense and is mentally incompetent).

The evidence established that Newman was unable to make decisions about his fundamental rights. He did not understand the role of the jury; thus, he could not make a rational choice about whether to request a jury trial. Testimony from Kavanaugh and Dillon as well as Newman's own unresponsive answer during the colloquy with the trial judge support the conclusion that Newman could not understand the meaning of a constitutional right, including his constitutional right to testify or not to testify. It is evident that a defendant that does not understand his fundamental rights cannot make rational decisions about those rights.

Johnson's failure to investigate Newman's fitness and request a fitness hearing was constitutionally deficient. Had Johnson investigated and requested a fitness hearing, there is a reasonable probability that Newman would have been found unfit had a hearing been held. Accordingly, Newman is entitled to habeas relief.

III.    Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of Newman's habeas petition.